Michael Timm **RINEHART**, Plaintiff,

v.

Lou V. **BREWER** et al., Iowa State Penitentiary, Defendants.

Ronald H. **BROWN**, Plaintiff,

v.

Lou V. **BREWER** et al., Iowa State Penitentiary, Defendants.

Civ. Nos. 72–135–2, 72–154–2.

United States District Court, S. D. Iowa, C. D.

June 6, 1973.

---

Robert D. Bartels and Mark E. Schantz, Iowa City, Iowa, for plaintiffs.

Lorna L. Williams and Thomas R. Hronek, Asst. Attys. Gen., Des Moines, Iowa, for defendants.

## MEMORANDUM AND ORDER.

HANSON, Chief Judge.

These are civil actions brought by two inmates of the Iowa State Penitentiary at Fort Madison, Iowa, against the warden and other prison administrators under 42 U.S.C., Section 1983 for damages and injunctive relief. The dispute grows out of the enforcement of prison hair regulations against the petitioners. Plaintiff Rinehart commenced suit by filing a *pro se* complaint on June 30, 1972, which was amended on July 20, 1972. His action was subsequently joined with Brown v. Brewer, which involved a similar challenge, and a hearing on the consolidated cause was held by the Court on July 28, 1972. By stipulation of the parties, Brown's cause was submitted on the facts as they relate to Rinehart.

## STATEMENT OF FACTS

The salient facts in this cause as found by the Court are as follows:

On June 17, 1972, the plaintiff Rinehart was approached by Donald Menke, Captain of the Prison Guards, and informed that his hair was in violation of prison regulations. Regulations in force at that time required that hair be kept above the collar in back and above the ears on the side. No beards were allowed, but mustaches which did not extend beyond the corners of the mouth

were permitted under the rule.[1] Rinehart was also told by Captain Menke that he had until June 19 to conform to the rule. On June 19, 1972, upon his continued refusal to cut his hair, Rinehart was placed in administrative segregation by order of Captain Menke. No hearing was granted Rinehart before his segregation and no higher official either reviewed or ratified Captain Menke's order. The prisoner was told at this time that he would be released as soon as he agreed to a haircut and shave.

Rinehart was brought before the Prison Adjustment Committee on July 12, 1972, where he again indicated his reluctance to comply with the hair rule. Neither at the time of his original confrontation with Captain Menke nor at his hearing before the Adjustment Committee did Rinehart cite his religious beliefs as the motivating cause for his refusal to cut his hair. As an explanation for this, he testified that he had been told by Warden Brewer that the Church of the New Song would not be recognized. After his hearing, Rinehart was returned to administrative segregation where he has presumably remained during the disposition of this cause.

Plaintiff Brown's *pro se* complaint was filed in this Court on July 19, 1972, approximately three weeks after Rinehart's petition. The complaints alleged substantially similar constitutional violations. Both inmates profess to be devout members of the Church of the New Song, a nascent religious order composed largely of inmates in federal and state prisons. They claim that to cut their hair would violate their religious precepts and that to punish them for their refusal deprives them of rights under the Free Exercise Clause of the First Amendment. They further claim that the method of enforcement denied them sundry procedural due process rights under the Fourteenth Amendment and that the rule in any event must be voided as capricious, arbitrary, and rationally unrelated to any compelling state interest. It is also urged that the administrative segregation involved here constitutes a cruel and unusual punishment in violation of the Eighth Amendment. Finally, plaintiff Rinehart contends that his summary placement in administrative segregation was prompted by his writing letters to the press and the Governor of Iowa critical of the prison adminis-

---

1. Warden Brewer's "Guidelines for Haircuts" which first appeared on November 22, 1971, and which was in force at the time of Rinehart's segregation, set forth the following standards:
"*Sideburns are permitted* to the bottom of the ear lobe and will not flare out. They should not be heavy growth and not exceed one-fourth inch thickness.
*Long hair is not permitted.* Hair will be neatly trimmed around the ears and tapered in the back so that it remains above the shirt collar.
*Mustaches will be allowed.* They are to extend no further than the corner of the mouth and no lower than the bottom of the lip. They must be neatly trimmed and no more than one half inch in length from the skin.
Facial hair other than sideburns and the mustache are not allowed."
These regulations have been superseded by the Warden's memo of December 4, 1972, to inmates and staff. These new guidelines provide as follows:
"*Sideburns*—to bottom of ear lobe.
*Hair Length*—may grow to the shirt collar, and bottom of the ears. May grow over the ears if desired.
*Mustaches*—will be allowed. They are to extend no further than the corner of the mouth and no lower than the bottom of the lip. They must be neatly trimmed and not more than one-half inch in length from the skin.
Facial hair, other than sideburns and the mustache, is not permitted.
The reasons stated above for controlling hair length are of major concern. Extreme variations are to be discouraged.
Safety and sanitation factors may compel the use of devices such as hairnets or tiebacks.
Discernible changes in appearance may be cause for re-photographing for identification purposes.
Any detection of contraband concealment in the hair shall be cause for ordering the offending individual to cut the hair."
The Court in the present opinion expresses no view as to the constitutional validity of the new rules, although it is to be expected that the same constitutional principles apply.

tration. In support of this contention Rinehart points to the fact that his hair was in violation of the rule for several months previous to his segregation and that the order to get a haircut was given to him only two or three days after he mailed critical letters to the Governor of Iowa and the news media.

The State admits most of the facts as outlined above, but denies that the punishment was in any way a retaliation against Rinehart for his critical communications. In reply to the Due Process claims, the State contends that prior hearings were unnecessary and that petitioners received all the process due them under the circumstances. The State furthermore casts doubt upon the sincerity of petitioners' religious beliefs. In any event, the State argues that even if a compelling interest test is used, there are several legitimate state interests supporting the rule, any of which is sufficient to warrant whatever encroachment of First Amendment rights may have occurred.

## THE CRUEL AND UNUSUAL PUNISHMENT CLAIM

The Court finds that it can readily dispose of petitioners' Eighth Amendment challenge to the hair rule. Petitioners claim that, given the nature of the offense, their indefinite placement into administrative segregation constitutes a cruel and unusual punishment within the meaning of the Eighth Amendment. The Court cannot agree.

This Court is under no illusions concerning the relative gravity and severity of "administrative segregation," which is but a palliative euphemism for what is more commonly known as isolation. Under present practices at Fort Madison Penitentiary, administrative segregation involves an almost total loss of privileges. An inmate in administrative segregation is kept physically isolated from all other prisoners in a single cell and may no longer attend his work or classes. Thus his wages and course credits are lost. He receives no exercise and is only allowed to leave the cell once or twice a week for a shower. In addition to these losses, the practical effect of administrative segregation may be to increase the actual time an inmate spends in prison, since time spent in segregation may not count in a prisoner's "good time" service. Apparently, however, this is not so for Rinehart, since he is serving a life sentence.

■ It may readily be admitted that such punishment is, at the least, unpleasant for the inmate. It seems equally true that the "sensory deprivation" and mental anguish suffered by an inmate in administrative segregation may in some cases be as painful as more traditional forms of physical punishment.[2] Yet given the long history and widespread use of the practice, the Court cannot say that it is a cruel or unusual punishment as those words have been defined, albeit with some imprecision, by the Supreme Court. Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L. Ed. 793 (1917); Trop v. Dulles, 356 U. S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958); Robinson v. California, 370 U. S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

■■ The accepted test under these cases is whether the discipline is of such a nature that it would shock the general conscience, Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968), or violate universally-held precepts of fairness. Robinson v. California, *supra*. It has been held that segregation *per se* is not a cruel or unusual punishment, Burns v. Swenson, 430 F.2d 771 (8th Cir. 1970), and that long or indefinite segregation may be justified in some instances. Winsby v. Walsh, 321 F.Supp. 523 (C.D.Cal.1971). Of course, it is nonetheless true that a

---

2. There is a growing interest among scientific and legal researchers concerning the nature and effects of segregation practices in the prisons. See, e. g., Singer, Con-fining Solitary Confinement: Constitutional Arguments for a "New Penology," 56 Iowa L.Rev. 1251.

punishment normally acceptable may become "cruel and unusual" if it is disproportionate in relation to the offense. Weems v. United States, *supra.*

This Court is not convinced that most people would find the punishment administered here shocking or abhorrent to their consciences. Despite reservations the Court may have concerning the ultimate efficacy or propriety of isolation in most cases, it cannot be said with a high degree of certainty that such measures are never useful or even necessary for the proper control of a prison population. Their abolition must await the development of satisfactory alternatives for prison discipline and advanced societal standards of decency. It is not the proper function of this Court to choose for prison administrators the best methods for rule enforcement. Once the constitutionality of a practice is established, the inquiry ends.

The Court therefore holds that the present practice of administrative segregation at the Fort Madison Penitentiary, where not grossly disproportionate to the nature of the offense, does not constitute a cruel or unusual punishment under the Eighth Amendment. The Court further holds that under these facts, the indefinite segregation of petitioners was not overly disproportionate to the alleged offense so as to offend the Eighth Amendment.

## CONSTITUTIONAL VALIDITY OF THE HAIR RULE

Plaintiffs have raised a wide variety of constitutional objections to the hair rule. It is alleged that the rule on its face is unreasonable, arbitrary, and capricious in violation of the Due Process Clause of the Fourteenth Amendment. It is further alleged that the rule as applied works an unconstitutional infringement upon Rinehart's right to observe his religious beliefs under the First Amendment. Finally, it is urged that there is a constitutional right to govern personal appearance which is abrogated by the hair rule.

Analysis of these specific claims may most properly begin with an examination of the scope of constitutional rights in general in a prison context. It is beyond dispute that the supervision of state prisons is a legitimate and important state function and that state prison authorities are vested with a wide degree of discretion and control in the day-to-day operations of their facilities. Wright v. McMann, 257 F.Supp. 739 (D.C.N.Y.1966); Burns v. Swenson, 430 F.2d 771 (8th Cir. 1970), *cert. den.* 404 U.S. 1062, 92 S.Ct. 743, 30 L.Ed.2d 751 (1972). The practical effect of incarceration upon individual liberties is given expression in the oft-quoted words of the Supreme Court, " . . . lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1956 (1948).

Equally clear is the basic principle that a citizen does not lose all his rights as a result of incarceration, Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968), and a federal court cannot eschew its responsibility to investigate alleged constitutional deprivations by reason of the wide discretion vested in prison administrators. See Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 273 (1972). Thus where a state prison regulation conflicts with a paramount federal constitutional or statutory right, the regulation may be invalidated. Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L. Ed.2d 718 (1969); Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964).

The test for determining precisely what constitutional rights are lost as a result of incarceration has been defined a number of times by the federal courts. The Sixth Circuit has stated "A prisoner retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from

him by law." Coffin v. Reichard, 143 F. 2d 443 (6th Cir. 1944). The *Coffin* formulation was reiterated by the Fifth Circuit, which added " . . . any further restraints or deprivations in excess of that inherent in the sentence and in the normal structure of prison life should be subject to judicial scrutiny." Jackson v. Godwin, 400 F.2d 529 (5th Cir. 1968). As this Court noted in Lathrop v. Brewer, 340 F.Supp. 873, 876 (S.D.Iowa 1972), constitutional rights " . . . are not lost upon the closing of the prison gates, but are only constricted by the necessary accoutrements of incarceration, Courtney v. Bishop, 409 F.2d 1185 (8th Cir. 1969), cert. den. 396 U.S. 915, 90 S.Ct. 235, 24 L.Ed.2d 192."

█ Despite these varying linguistic formulations, the basic test seems clear. If a person possesses a constitutional right before imprisonment, then that right is retained after imprisonment also, unless it is specifically taken away by the terms of punishment or is plainly inconsistent with imprisonment itself. An example of the latter category might be the right to travel, which is wholly incompatible with the loss of freedom implicit in incarceration.

█ The only lawful punishment for inmates generally is their incarceration itself and the mere fact that a man is a convict does not give his jailor license to thereby impose upon him deprivations in excess of those explicitly authorized by the law. Jackson v. Godwin, *supra*. In short, regulations of personal conduct such as the hair rule presently under review may not be justified by bare reference to administrative discretion if constitutional rights are called into question. Such reasoning is essentially circular and may disguise a subliminal and widely-held belief that prison regulations are somehow meant to act as further punishments for the inmate or are not subject to traditional standards of reasonability and fairness. Reason and authority reject such a conclusion.

Administrative discretion does, however, have its proper place in the constitutional balance. Prison administrators are charged with the duty of supervising institutions designed primarily for the detention and rehabilitation of their inhabitants. It is unquestionably a complex, challenging, and often frustrating task. In order to perform this task properly, prison supervisors necessarily must oversee and regulate a wide range of internal activities. In doing so, they must take into account the myriad factors which may potentially bear upon the safe and efficient operation of the prison. As the state officials closest to the situation, their identification of problems and solutions must be accorded the respect which their experience and perspective warrants. Furthermore, it seems self-evident that the characteristics of prisons and prison populations are such that the occasions under which regulations may be necessary or desirable are greater than in society at large.

█ With these considerations in mind, the proper role of administrative discretion in the constitutional framework is not difficult to discern. No constitutional right is absolute in the sense that it may never be infringed to the degree necessary to effectuate legitimate and pressing state concerns. This is precisely what is meant by the term "necessary accoutrements of incarceration" in the *Lathrop* case, *supra*. It is no more than a recognition of the fact that the number of state interests which may justify narrowly-tailored encroachments upon protected freedoms is greater in a prison setting than in almost any other area of state regulation. The true constitutional balance leaves the state free to deal effectively with any contingency. The only restraint is that it may not choose means which too broadly stifle fundamental rights when less restrictive alternatives are reasonably available.[3]

3. This now familiar stricture of Due Process, applicable to the states through the

Fourteenth Amendment, was stated most cogently in N.A.A.C.P. v. Alabama, **377**

The question now arises whether the petitioners possess a constitutional right which is substantially abridged by the hair rule. The right to govern one's personal appearance does not find explicit recognition in the Constitution, but has been acknowledged on many occasions. See Crews v. Cloncs, 432 F.2d 1279 (7th Cir. 1970); Richards v. Thurston, 424 F.2d 1281 (1st Cir. 1970). This right was recently given substance in this Circuit by Bishop v. Colaw, 450 F.2d 1069 (8th Cir. 1971). The *Bishop* case concerned high school hair regulations substantially equivalent to the present hair rule at Fort Madison. After a review of the cases the Court of Appeals in *Bishop* found that there was a constitutional right to govern one's personal appearance. The Court found it unnecessary to specifically isolate the source of this right, whether in the Ninth Amendment, the Fourteenth Amendment, or the right to privacy. However, the Court had no difficulty in ascertaining the essential nature and effect of this right. "As a freedom which ranks high on the spectrum of our societal values, it commands the protection of the Fourteenth Amendment Due Process Clause." Bishop v. Colaw, *supra*, at 1075. As a consequence thereof, the Court concluded that the burden was upon the high school administrators to establish the necessity of infringing upon the student's freedom in order to carry out a valid educational objective. After reviewing the justifications offered by the administrators, the Court found that only two, shop class safety and swimming pool sanitation, bore any rational relationship to the rule, and that these objectives could readily be achieved by less restrictive rules such as requiring swimming or shop caps. The regulation was thus struck down as an unconstitutional infringement of the right to govern personal appearance.

The defendants cite two Eighth Circuit cases to the effect that there is no constitutional right to govern hair length in a federal or state prison. Ralls v. Wolfe, 448 F.2d 778 (8th Cir. 1971); Blake v. Pryse, 444 F.2d 218 (8th Cir. 1971). A careful reading of these cases will disclose that they are totally consistent with *Bishop*. The Court concludes, after giving careful consideration to *Ralls*, *Blake* and *Bishop*, together with the recent decision of the Eighth Circuit in Stradley v. Anderson, 473 F.2d 188 (8th Cir., 1973), that the hair rule at the Iowa State Penitentiary is not an unreasonable infringement upon the inmates' constitutional right to govern personal appearance.

■ The *Bishop* case states that the people of these United States have a constitutional right to govern their personal appearances which is afforded the protection of the Fourteenth Amendment. This right, however, is not a so-called fundamental freedom, which the State could abridge only upon the showing of a compelling State interest. Rather, this right can be restricted if the State can show that it has a rational basis for so doing. Thus, the Court will not interfere with the State's regulation if the State can show that the regulation is rationally related to a legitimate State purpose. Here, as in most constitutional cases, the Court must weigh the right of the individual against the interests of the State.

Maximum security prisons are quite different from a public secondary school. In a public school, the students are presumed to be fairly responsible—to be able to conform themselves to the requirements of an orderly society. Even though the school must have the authori-

---

U.S. 288 at 307, 84 S.Ct. 1302, at 1314, 12 L.Ed.2d 325 (1963): ". . . a governmental purpose to control or regulate activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedom." Furthermore, "The breadth of legislative abridgement must be viewed in the light of less drastic means for achieving the same basic purpose." Shelton v. Tucker, 364 U.S. 479 at 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960).

ty to instill discipline in the student in regard to his conduct at school, many facets of the student's life in society, such as his personal appearance, are not the primary responsibility of the school, but rather of the parent. Thus, it would be only in an unusual situation where the school would have a good reason for governing the student's personal appearance, an area which is normally left for determination by the student and his parents. In substance, this is the law stated in Bishop v. Colaw.

The inmates of a maximum security institution are not to be compared to students in a public school. These men have been adjudged, under the law, to have *willfully* failed to conform themselves to the requirements of society in some substantial respect. They have been adjudged as disciplinary problems to society. The State has been given absolute authority to supervise their conduct and, hopefully, to rehabilitate them to the status of responsible citizens. Reasons given by the State which would be inadequate to justify restrictions on the personal appearance of students can be very adequate when applied to inmates of a maximum security prison.

The Court concludes that the State has sustained its burden of showing a rational basis for restricting the hair length of inmates. First, granting inmates the freedom to wear their hair, including facial hair, in any manner of their choosing could lead to problems of identification. Security of the institution demands that prison officers be able to readily identify inmates. Emergency situations requiring instant identification exist often enough so that prison officials should be given latitude to deal with them. That the present rule could cause identification problems is to the Court only a justification for an even more restrictive hair rule.

Health and safety are also good reasons for the State to regulate the hair of inmates. Sanitation is a problem when large groups are confined in limited space. Additionally, inmates live and work around machinery and other mechanical devices which could pose safety problems to inmates with long hair. Moreover, long hair makes for good grabbing when fights break out. Here, again, the Court emphasizes that the State is dealing with men who have refused to conduct themselves responsibly. These reasons, although perhaps not overly convincing, give the hair rule a sufficient rational basis. The Court will not substitute its judgment for that of prison officials who have superior experience in dealing with the realities of penal institutions. The State also has a legitimate interest in instilling discipline in inmates. These men have shown an unwillingness to adhere to society's rules. The State has an interest in seeing to it that these men can follow rules. When coupled with the State's interest in identification, security, health and safety, the matter of instilling discipline by use of the hair rule becomes a legitimate State interest. Stradley v. Anderson, *supra.*

### PETITIONERS' RELIGION CLAIM

Petitioners allege that the hair rule runs counter to their religious convictions and therefore cannot be enforced against them because of the Free Exercise Clause of the First Amendment. Evidence submitted to the Court indicates that the petitioners are members of a religious organization called the Church of the New Song. This Church preaches that every man should strive for inner peace in himself and should not interfere with the rights of others to find their own inner peace. One of the tenets of the Church is the doctrine of naturalness—that every man should be free to project his natural image. This, of course, would mean that if a member felt that his inner peace could only be achieved through wearing his hair and beard as long as they would grow, then he should do so. Unlike some religious groups, however, the Church of the New Song does not require its members to wear their hair in any certain

way. A member can cut his hair and beard and still be a bona fide member. It is a matter of personal choice—whatever the individual feels is needed to achieve his inner peace is sanctioned by the Church of the New Song as being a religious tenet.

Even if this Court were to recognize the Church of the New Song as a valid religion, it could not hold that the Free Exercise Clause is violated by the prison's hair rule in this situation. This religion does not have any tenet concerning hair which this Court can consider to be fundamental to the religion. Petitioners urge that members of the Amish or Orthodox Jewish faiths could not conscientiously abide by the hair rule of the Iowa State Penitentiary. In the first place, no members of these faiths are presently in the prison. But in the event that such a case does occur, the Court will deal with it at that time. The beliefs of the Church of the New Song are in no way similar to those of the Amish or the Orthodox Jews concerning hair. *See* Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

The Court believes that the Free Exercise claim can be disposed of with a quotation from Evans v. Ciccone, 377 F. 2d 4, 6 (8th Cir. 1967):

Appellant assumes that practice of his newly acquired faith permits violation of prison discipline. Such assumption is basically incorrect. Sostre v. McGinnes, 2 Cir., 334 F.2d 906. See also, Barkin, The Emergence of Correctional Law and the Awareness of the Rights of the Convicted, 45 Neb.L.Rev. 669, at 682–84. Freedom of religion is recognized as within the proper exercise of a federal constitutional right for prisoners. Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030; 20 Rutgers L.Rev. 538 (1966). However, involved is the familiar problem of alleged personal freedoms clashing with powers that govern. Freedom of religion can nev-

er mean freedom to interfere with the peaceful rights of others, or freedom to flagrantly disregard reasonable rules of conduct in or out of prison. Cf. Desmond v. Blackwell, M.D.Pa. 1964, 235 F.Supp. 246. As early as 1878 Chief Justice Waite said if "professed doctrines of religious belief [are made] superior to the law of the land [it would] in effect * * * permit every citizen to become a law unto himself. Government could exist only in name under such circumstances." Reynolds v. United States, 98 U.S. 145, 166–167, 25 L.Ed. 244.

## PETITIONERS' DUE PROCESS CLAIMS

Both petitioners claim that the method of enforcement of the hair rule violated their procedural due process rights under the Fourteenth Amendment in that they were denied a hearing before an impartial tribunal prior to imposition of punishment. In Lathrop v. Brewer, supra, this Court dealt with the precise issue of what procedural safeguards are constitutionally required in the administration of the Fort Madison Penitentiary.

This Court is not about to retreat from the minimal due process requirements set out in Lathrop v. Brewer, *supra.* A pre-punishment hearing before an impartial tribunal serves to guarantee that a prisoner is not at the mercy of a single administrator's unfettered discretion by assuring that the chief witness against him may not also impose punishment. Though a serious factual dispute will rarely be presented by a grooming regulation of this type, the potential adverse consequences to the prisoner are of a magnitude that they overwhelm whatever interest the state may have in summary adjudication.

■ This is not to suggest that the full panoply of procedural rights due a criminal defendant need be extended to an inmate charged with a prison rule

infraction.[4] The prior hearing need not involve large expenditures of time or money by the state, since courtroom formalities are basically inapplicable to such proceedings.

This Court concludes that a prior hearing is a *sine qua non* of any alleged rule infraction involving serious consequences for the inmate. Whenever such an infraction is charged, the following procedures are required by Due Process before punishment may be imposed:

The inmate must be given timely notice of the pendency of disciplinary procedures against him and the nature of the offense with which he is charged. Within a reasonable period of time he must then be given a hearing before whatever tribunal or individual makes the decision as to what punishment will be imposed. Such a tribunal or individual must be impartial, that is, the accusing or investigating officer may not also bear responsibility for the ultimate decision reached. Some participation by the investigating officer in the proceedings will not necessarily taint the result, however. What is essential is that the fairness and objectivity of the decision-making body remain unimpaired. At the hearing, the inmate must be given a fair and meaningful chance to explain his side of the story, to question the accusing witnesses, and to present defenses or mitigating circumstances to the decision-maker. The inmate must also be given a reasonable chance to present witnesses on his behalf where fairness demands. The decision-maker need not follow judicial rules of evidence or prepare a transcript, but a basic record of the substance of the proceedings, the disposition reached, and the reasons therefor should be made. This is to insure that the decision reached will be based on an unbiased record.

The above procedures are precisely those which the Supreme Court in Goldberg v. Kelley, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) found to be the "rudimentary" requirements of due process where administrative action threatens the individual with serious loss. To retreat from these minimum safeguards would be to endanger precious constitutional rights which protect all citizens.

Of course, different considerations inhere in an emergency situation. Where an inmate's behavior presents a real danger to himself or others, the state's interest in summary segregation may outweigh the need for a prior hearing. But in this event the inmate must still be accorded a hearing as soon as reasonably practicable. The Court will not attempt to firmly set a period of time beyond which the failure to provide a hearing after summary segregation will be considered a violation of Due Process, but in the absence of special and compelling circumstances, it can be presumed that a delay of more than 48 hours will probably be considered prejudicial to the rights of the prisoner.

The foregoing analysis shows conclusively that these petitioners were denied their procedural rights under the Fourteenth Amendment. No hearing was afforded them until three weeks after the imposition of punishment, a clear violation of the prior hearing requirement. As noted previously, the fact that the offense is admitted or that no factual dispute is present does not vitiate entirely the important personal and social interests served by a prior adjudicative hearing. Nor was there a satisfactory showing by the state of special factors which might justify treating this as an emergency situation.

The final question remains of the proper remedy to be afforded the petitioners. The difficulty in this regard is the fact that the issue is largely moot, since petitioners have received their

---

4. This may not be so where the infraction is at the same time a criminal offense for which the inmate may eventually face trial. In such cases, it seems probable that the full rights to counsel, etc., may well be necessary under the Due Process Clause.

hearing, however untimely. To vacate the decision of the Adjustment Committee would be a meaningless action. Furthermore, the Court cannot find that the petitioners sustained any damages.

The Court will attribute the failure of the State to abide by the standards of *Lathrop* in this instance to a good faith misunderstanding of the scope of the decision. The Court understands that Iowa prison officials are implementing the *Lathrop* standards as rapidly as possible through the promulgation of new rules. Let it be understood, however, that the Court will no longer tolerate disciplinary action taken in violation of *Lathrop*.

## PETITIONER RINEHART'S FIRST AMENDMENT CLAIM

Plaintiff Michael Rinehart contends that he was placed in administrative segregation because of a letter he wrote to Governor Ray and to the press which was critical of certain prison policies. He presented no evidence but claims that the defendants' motives may be inferred by the circumstances.

Captain Menke, the officer who caused plaintiff Rinehart to be placed in segregation, testified that he knew of no letter to Governor Ray or any newspapers at the time he approached Rinehart concerning his hair length. Warden Brewer denied that any letter was the cause of plaintiff Rinehart's segregation. In addition, the evidence shows that at least two other inmates, including plaintiff Brown, were in segregation for failure to cut their hair.

Warden Brewer testified that it is not accepted practice to segregate an inmate at the exact time at which his hair exceeds the prison regulation. Rather than immediately segregating an inmate, the prison officials attempt to persuade a violating prisoner to get his hair trimmed voluntarily. Only when this fails and an inmate's hair has clearly grown to the length where he is in complete and open violation of the regulation to an extent likely to cause difficul-

ties in the administration of the regulations is the prisoner segregated from the general population.

Clearly, had Rinehart been placed in administrative segregation for petitioning the Governor and writing to the press, this action would have been unconstitutional. On the evidence before this Court, however, the Court cannot find that Rinehart was punished for exercising his freedoms of speech and to petition the government for redress of grievances.

Accordingly, it is ordered that the above-entitled causes of action be, and they are hereby dismissed.