**Jerry TETERUD, on behalf of all others similarly situated, Plaintiffs,**

**v.**

**James GILLMAN, Commissioner of Social Services, et al., Defendants.**

**Civ. No. 73–85–2.**

United States District Court,
S. D. Iowa, C. D.

Nov. 20, 1974.

Robert D. Bartels and Mark E. Schantz, Iowa City, Iowa, and Roy S. Haber, Atty., Native American Rights Fund, Boulder, Colo., for plaintiffs.

Richard C. Turner, Atty. Gen., State of Iowa, and Sp. Asst. Attys. Gen., Lor-

na L. Williams and Michael P. Murphy, Des Moines, Iowa, for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

HANSON, Chief Judge.

This is a civil action filed by an American Indian inmate of the Iowa State Penitentiary at Fort Madison, Iowa, against the warden and other prison officials and administrators, under 42 U.S.C. § 1983, for declaratory and injunctive relief. The dispute grows out of the enforcement of the prison's hair regulation against the plaintiff and other American Indian inmates.

This action was commenced on April 4, 1973, when the plaintiff, Jerry Teterud, filed a *pro se* complaint on behalf of himself and all other American Indians confined within the Iowa correctional institutions under the jurisdiction of the Bureau of Adult Corrections. The complaint as subsequently amended on August 16, 1973, alleges deprivations under color of state law of rights secured by the First and Fourteenth Amendments to the United States Constitution, to-wit: That the named plaintiff and other American Indian inmates have been denied (1) the right to freely exercise their religion, (2) the right to govern their personal appearance, (3) their rights of free expression, and (4) their right to the equal protection of the laws, and pray for declaratory and injunctive relief. A temporary restraining order was issued by this Court on August 23, 1973, enjoining the defendants from taking disciplinary action against the plaintiff and the other members of the class stated herein for violation of the prison's hair regulation. A hearing was held on the merits on October 19, 1973, at which time the Court extended its order until the parties could take further depositions, and brief their respective positions; and, until the United States had an opportunity to file its amicus curiae brief.

## FINDINGS OF FACT

Plaintiff Jerry Teterud is one-half Cree Indian and one-half white, that is, his father was a Cree Indian and his mother was a white woman. His parents were separated when he was a child, and he did not see his Indian father after the separation. During his youth Teterud was raised as Catholic in an orphanage. It was not until adulthood that the plaintiff accepted his Indian ancestry and became interested in Indian customs and life.

Defendant Lou V. Brewer is the Warden of the Iowa State Penitentiary and is responsible for the operation and administration of the Iowa State Penitentiary, and is delegated the authority to promulgate rules and regulations for the care and discipline of the inmates.

Defendant Nolan Ellandson is the Director of the Department of Adult Corrections for the State of Iowa and is responsible for the overall supervision of the correctional institutions, including the Penitentiary, wherein the plaintiff is housed.

The plaintiff is under the jurisdiction of the defendants.

On or about December 8, 1972, Warden Brewer posted a hair length regulation which stated:

> *Hair length* may grow to the shirt collar, and bottom on the ears. May grow over the ears if desired.

The plaintiff Teterud requested of defendant Brewer, by letter on March 2, 1973, that he be permitted to wear his hair in the traditional Indian style for religious reasons. On March 16, 1973, defendant Brewer notified Teterud that permission had been denied. In so notifying the plaintiff, Warden Brewer stated, "While I can appreciate your reasons and desires to do this, and accept in good faith the ethnic, religious and cultural reasons that you stated, I believe the attached policy governing hair length to be valid."

On October 19, 1973, a hearing was held on the merits of this cause. Plain-

tiff's first witness was Wallace Black Elk, a Sioux medicine man, who has lived for many years on the Rosebud Indian Reservation in South Dakota and who testified about Indian religion and culture. Black Elk testified that the Indian religion and culture are tied together and that Indians live by nature. Black Elk further testified that he perceived the Great Spirit [1] as wearing long hair.

Preston Holder, an anthropologist from the University of Nebraska, testified that the Plains Indians' religion expressed itself in their daily lives and that there was no division between the secular and sacred, that is, that everything is related to religion. Holder further indicated that one of the spiritual customs of Indians is to cut off their hair to show grief or humility after a close relative has died.

Robert Thomas, another anthropologist, described the importance of physical appearance of the Cree Indians with regard to spiritual matters. Thomas noted that it was a traditional Cree custom to wear their hair in long braids. He further testified that on very serious religious occasions the Cree would unbraid their hair.

Maria Thompson Parson, also known as Running Moccasin, a full-blooded Yankton Sioux Indian, was called by the defendants and testified that in her opinion the hair length of a male Indian is a matter of individual preference. She further testified that she had attended many Indian religious ceremonies across the United States and that the Indian male does not necessarily wear his hair long in these ceremonies.

Dr. Douglas Johnson, a practicing psychiatrist, who at times relevant to this matter was clinical director of the state security hospital, also known as the Iowa Security Medical Facility, which is a state hospital that diagnoses and recommends treatment for felons with mental problems, testified that the plaintiff, Jerry Teterud, was a patient of his. Dr. Johnson described Teterud when he first came for treatment as having a passive-aggressive personality which was based in part upon childhood rejection, including feelings of being "unworthy as an Indian" and being "just another god-damn Indian kid." Dr. Johnson advised Teterud that his low opinion of himself could change and that he should "start taking pride in being a red man, or an Indian, as opposed to feeling bad about it." Dr. Johnson further testified that the compelled cutting of Teterud's hair would generally be counter-productive to rehabilitation and, therefore, that the cutting of Teterud's hair would have no beneficial effect.

Robert Sarver, the former Commissioner of Corrections of Arkansas and West Virginia, testified that from the standpoint of criminology and penology, the instilling of racial and cultural pride in a member of a racial minority would be an important factor in successful rehabilitation.

## CONCLUSIONS OF LAW

The plaintiff has raised a variety of constitutional objections to the hair rule based upon the First and Fourteenth Amendments to the United States Constitution. The plaintiff contends that the enforcement of the hair regulation violates his right to the free exercise of religion; that the hair regulation unconstitutionally infringes upon his right to govern his personal appearance; that the hair regulation impermissibly infringes upon his right to freedom of expression; and that the defendants' hair length regulation unconstitutionally discriminates against him upon the basis of race.[2]

---

1. As described by Black Elk, the Great Spirit is a God-like figure to the Indians and represents a power or being greater than man.

2. In this Order, the Court will not discuss the plaintiff's last three contentions since a discussion of the free exercise claim will be dispositive of the remaining three contentions.

The Court agrees with the plaintiff and believes that the prison's hair regulation does, in fact, infringe upon the plaintiff's First and Fourteenth Amendment rights.

### Free Exercise of Religion

The plaintiff claims that the wearing of long hair is part of his traditional spiritual beliefs and as such is entitled to First Amendment protection. In considering whether the prison's hair regulation infringes upon the plaintiff's constitutional right to the free exercise of his religion, two issues must be considered—first, whether or not an Indian's cultural and traditional beliefs constitute a religion and, secondly, whether the plaintiff possesses a sincere belief in his creed. Remmers v. Brewer, 361 F. Supp. 537, 542 (S.D.Iowa 1973), aff'd 494 F.2d 1277 (8th Cir. 1974); United States v. Ballard, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944); United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965).

The plaintiff relies on Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), to support his contention that an Indian's cultural and traditional beliefs constitute a religion. In Yoder, the defendants, members of the Old Order Amish religion and the Conservative Amish Mennonite Church, were violating Wisconsin's compulsory school attendance law, which required school attendance by children under age sixteen, by refusing to send their children to school after graduation from the eighth grade. The Court found that the Wisconsin's compulsory school attendance law violated the rights of the Amish under the Free Exercise Clause since the Amish demonstrated that they had a sincere religious belief and that the "Amish mode of life and education is inseparable from and a part of the basic tenets of their religion." Id. at 219, 92 S.Ct. at 1535.

Much of the testimony of the plaintiff's witnesses described the cultural and traditional ways of Plains Indians and their inseparability from spiritual beliefs. In United States v. Seeger, supra, 380 U.S. at 176, 85 S.Ct. at 859, the Supreme Court interpreted religious beliefs as follows:

Within that phrase would come all sincere religious beliefs which are based upon a power or being, or upon a faith, to which all else is subordinate or upon which all else is ultimately dependent.

The Indians' beliefs are based upon the existence of a Great Spirit, a power or being greater than man and, thus, clearly bring them within the foregoing definition.

■ For the requested relief to be appropriate, there must be a link between hair style and the plaintiff's religion. The plaintiff has introduced evidence which indicates that the wearing of traditional hair styles has always been an important aspect of the spiritual life of Indians and a fundamental spiritual custom. On the other hand, the defendants have introduced evidence which rebuts the plaintiff's contentions and indicates that an Indian's hair length is unrelated to his spiritual beliefs and is, in essence, a matter of individual preference. The Court has studied this testimony and must conclude from the testimony of Wallace Black Elk, Preston Holder, and Robert Thomas that hair length is a tenet of the Indian religion. An Indian's hair length can have sufficient religious significance to make a forced cutting of that hair an encroachment on the Indian's First Amendment rights. An Indian, however, may wish to wear his hair in the traditional style for a variety of reasons. The Court will not speculate as to why an Indian wears his hair one way or the other. It suffices to say that if an individual Indian's belief in the Indian religion is honest, made in good faith, and sincere, he should be allowed to wear his hair in the traditional style.

■ Next, the Court must consider whether Teterud's religious beliefs are sincere. It is difficult to ascertain whether any individual holds "sincere"

religious beliefs because there is no way the Court can probe the inner workings of the plaintiff's mind. The plaintiff has attempted to show that he is sincere and that his beliefs have a deep-rooted psychological origin stemming, in part, from early childhood rejection due to his being an Indian. Furthermore, Warden Brewer in notifying Teterud that permission to wear hair in the traditional style had been denied seems to indicate that Teterud was sincere in his beliefs. On the other hand, the Court must note that Teterud was raised as Catholic in an orphanage during his youth. The record further discloses that it was not until adulthood that Teterud became interested in his Indian ancestry and heritage. In addition, prior to trial, Teterud was an active member of the Church of the New Song, a religious organization which this Court recognized as such in Remmers v. Brewer, *supra*. At best, the evidence on the issue of the plaintiff's sincerity is somewhat contradictory. The thrust of the defendants' challenge to Teterud's sincerity stems from the fact that the plaintiff's reawakened interest in Indian customs and life appears to be of very recent vintage. This challenge must be viewed, however, in light of the additional fact that Teterud has spent the bulk of his life in various institutions wherein his active desire to pursue the Indian way of life may have been somewhat constrained. The Court can never know with assurance whether Teterud is sincere or insincere. The defendants, however, have not presented sufficient evidence to show that Teterud's beliefs are not made in good faith. Thus, this Court concludes from this evidence that the Plains Indians have a religion in which hair plays a central role and that the plaintiff's belief in this religion is sincere.

■ Two other courts in recent decisions considering the same issue as raised herein, however, have failed to give the aggrieved parties any relief. In New Rider v. Board of Ed. of Ind. Sch. Dist. No. 1, Okl., 480 F.2d 693 (10th Cir. 1973), three Pawnee Indian junior high high school students brought an action to enjoin the enforcement of the school's hair regulation contending, *inter alia*, that the hair regulation infringed upon their right to the free exercise of religion. The Tenth Circuit affirmed the district court's summary dismissal which found that no substantial federal question was raised by the plaintiffs' complaint. Chief Judge Lewis in his concurring opinion made the following observations regarding the Pawnee Indians:

The Pawnee are near-pantheists, their every act having religious significance in their basic desire to live in harmony with the Universe. Hair styles, as the trial court correctly recognized, have traditional but variable significance to the Pawnee according to the trend of modern custom or a desire to renew or popularize the style of their forefathers. Their present contention of religious oppression rises no higher under this record than a desire to express pride in their heritage through wearing long braided hair. Their desire so to do is understandable but not a constitutionally protected right.

In Goings v. Aaron, 350 F.Supp. 1 (D.Minn.1972), the petitioner, an Oglala Sioux Indian prisoner at the Federal Correctional Institution at Sandstone, Minnesota, brought a habeas corpus action contending that he had been denied his constitutional right to the free exercise of religion by being confined to an isolation area of the institution for refusing to have his hair cut in accordance with the institution's hair regulation. The court, after assuming *arguendo* that the plaintiff had a sincere religious belief, concluded that "the refusal to get a haircut even though in claimed exercise of religious freedom is subject to reasonable rules of conduct so as to require such." Based on the record in this case, the Court cannot agree with the conclusion of these two cases. An evaluation of the evidence indicates that the plaintiff's interest in wearing the traditional Indian hair style is predicated upon a sincere religious belief which must be constitutionally protected.

In Remmers, *supra,* this Court applied the following test in upholding the right of the Church of the New Song members to exercise their religion at the Iowa State Penitentiary:

When the state seeks to justify the granting or withholding of benefits and privileges based on religious classifications, the Equal Protection Clause of the Fourteenth Amendment demands that the state present a compelling interest which is served by the discrimination. Sherbert v. Verner, 374 U.S. 398, 406, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). The principle is equally applicable in a prison setting. Walker v. Blackwell, 411 F.2d 23 (5th Cir. 1969); United States *ex rel.* Jones v. Rundle, 453 F.2d 147 (3rd Cir. 1971); Brown v. Peyton, 437 F. 2d 1228 (4th Cir. 1971).

While this Court deems that the evidence presented in this case would justify applying the traditional compelling state interest test, relief can be granted to the plaintiff using the standard recently enunciated by the United States Supreme Court in Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L. Ed.2d 224 (1974). In *Procunier,* the Court analyzed prisoner mail censorship regulations issued by the Director of the California Department of Corrections and set forth the following test to be utilized in evaluating prisoners' First Amendment claims:

First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Sec-

ond, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad. *Id.* at 413–414, 94 S.Ct. at 1811.

Mr. Justice Marshall further elaborated on this test in his concurring opinion:

The State has legitimate and substantial concerns as to security, personal safety, institutional discipline, and prisoner rehabilitation not applicable to the community at large. But these considerations do not eliminate the need for reasons imperatively justifying the particular deprivation of fundamental constitutional rights at issue. *Cf.* Healy v. James, *supra,* 408 U.S. 169, at 180, 92 S.Ct. 2338, at 2345, 33 L.Ed.2d 266 (1972); Tinker v. Des Moines School District, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). *Id.* at 424, 94 S.Ct. at 1816–1817.

The defendants in the instant case have attempted to support the constitutionality of the prison's hair regulation by introducing evidence which amplifies the criteria used by this Court in Rinehart v. Brewer, 360 F.Supp. 105 (S.D. Iowa 1973), aff'd, 491 F.2d 705 (8th Cir. 1974), to uphold the constitutionality of said hair regulation. In *Rinehart,*[3] this Court concluded that the hair regulation at the Iowa State Penitentiary did not unreasonably infringe upon the prisoners' constitutional rights since the state had established a rational basis for restricting the hair length of inmates.

The Court concludes that the State has sustained its burden of showing a rational basis for restricting the hair length of inmates. First, granting in-

---

3. The decision in *Rinehart* is in accord with the weight of authority which upholds the right of prison officials to regulate the style and type of grooming of their inmates' hair. Blake v. Pryse, 315 F.Supp. 625 (D.Minn. 1970), aff'd, 444 F.2d 218 (8th Cir. 1971);

Ralls v. Wolfe, 321 F.Supp. 867 (D.Neb. 1971); 448 F.2d 778 (8th Cir. 1971); Wade v. Hutto, No. 73–1652 (8th Cir. filed August 2, 1974); Dilloff, Federal Court Litigation Over the Regulation of Adult Grooming, 38 Albany L.Rev. 387, 404 (1974).

mates the freedom to wear their hair, including facial hair, in any manner of their choosing could lead to problems of identification. Security of the institution demands that prison officers be able to readily identify inmates. Emergency stiuations requiring instant identification exist often enough so that prison officials should be given latitude to deal with them. That the present rule could cause identification problems is to the Court only a justification for an even more restrictive hair rule.

Health and safety are also good reasons for the State to regulate the hair of inmates. Sanitation is a problem when large groups are confined in limited space. Additionally, inmates live and work around machinery and other mechanical devices which could pose safety problems to inmates with long hair. Moreover, long hair makes for good grabbing when fights break out. Here, again, the Court emphasizes that the State is dealing with men who have refused to conduct themselves responsibly. These reasons, although perhaps not overly convincing, give the hair rule a sufficient rational basis. The Court will not substitute its judgment for that of prison officials who have superior experience in dealing with the realities of penal institutions. The State also has a legitimate interest in instilling discipline in inmates. These men have shown an unwillingness to adhere to society's rules. The State has an interest in seeing to it that these men can follow rules. When coupled with the State's interest in identification, security, health and safety, the matter of instilling discipline by use of the hair rule becomes a legitimate State interest. Stradley v. Anderson, *supra* [478 F.2d 188 (8th Cir.)]. *Id.* at 113.

Based on the record in this case, the Court believes that some of the criteria in *Rinehart* may be without substance since the evidence herein clearly demonstrates that the hair regulation is unnecessarily broad in its sweep. The evidence further demonstrates that there are viable alternatives which will protect the particular governmental interest involved.[4]

A brief review of the evidence will readily demonstrate that the justifications advanced by the defendants for upholding the hair regulation are either without substance or unnecessarily broad in their sweep. One of the reasons advanced for upholding the constitutionality of the hair regulation was sanitation. At the hearing in this case Warden Brewer testified that any sanitation problems that might arise in the kitchen could be taken care of by the use of hairnets or caps. The only reason advanced by the Warden for not utilizing hairnets was that it would create friction between inmates and prison officials. Both the plaintiff and Dennis Red Owl, another Indian inmate incarcerated at the Iowa State Penitentiary, however, indicated that they would have no objection to wearing hairnets for sanitation and safety purposes.

The next justification advanced by the Warden was that the hair policy created an "impression of sanitation." The Warden's justification for this criteria was based allegedly on complaints of inmates which filtered through the staff. The record reflects that this may have been, at best, an unsupported generalization and perhaps even somewhat contrived.

Another justification asserted by Warden Brewer was that long hair creates a hazard around machinery. Long hair may create a hazard in the shop

4. The presence of religious issues in this case, as well as a paucity of evidence justifying the hair regulation, allows the Court to avoid a direct repudiation of its holding in *Rinehart*. Even if the evidence presented herein was identical to that presented in *Rinehart*, the constitutionality of the defendants' hair regulation would be suspect. Two primary considerations would dictate such a modification of *Rinehart*: the Supreme Court's approach in *Procunier*, and Judge Lay's dissenting opinion in *Rinehart*, wherein he expressed reservations as to the Eighth Circuit's holding in Stradley v. Anderson, 478 F.2d 188 (8th Cir. 1973).

area but again the use of hairnets is a viable alternative.

Another of Warden Brewer's justifications was security. He maintained that prison officials have difficulty in identifying inmates with long hair and that inmates can hide contraband in long hair. These justifications are unnecessarily broad since there are viable less restrictive alternatives which can both allow the plaintiff to exercise his religion and accommodate the institutional needs of the prison administration. First, the record discloses that all inmates of the Iowa State Penitentiary are photographed shortly after their arrival at the institution. According to Warden Brewer, these photographs are taken for identification purposes. If an inmate grows his hair long, he can be easily reidentified by having a second picture taken. Secondly, regarding the contraband issue, Warden Brewer admitted not only that it would be easier to hide contraband on other parts of the body or in clothing, but also that a simple hair search done at the time of a body search would uncover contraband. Thus, any state interest can be protected by the aforementioned procedures.

Finally, Warden Brewer asserted that consideration of personal cleanliness bottomed his refusal to permit Indian inmates to wear their hair longer than the present regulations. On cross-examination, however, Brewer admitted that he had no reason to believe that inmates can't keep their long hair clean.

For all of the above reasons, the Court must conclude that the state has not advanced "reasons imperatively justifying" their infringement of the plaintiff's constitutional right to the free exercise of his religion. Hairnets, hair search and reidentification provide viable less restrictive alternatives which better accommodate the constitutional rights of the plaintiff and the institutional needs of the penitentiary. The overbreadth of the prison's hair regulation is further demonstrated by Warden Brewer's testimony contained in a deposition taken in March 1974, five months after the hearing in the case, and seven months after the hair regulation had been suspended for all inmates by the Warden. With 20 percent of the inmate population in violation of the hair regulation, Warden Brewer admitted that he had no problems with health, hygiene, contraband or security and that he had encountered no problems at all as a result of the relaxation of the regulation. Therefore, after reviewing all the evidence, the Court must conclude that the prison's hair regulation unconstitutionally infringes the plaintiff's First Amendment right to the free exercise of religion.

The plaintiff in this case has attempted to bring this action on his own behalf and on behalf of all other Indian inmates at the Iowa State Penitentiary as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. The Court declines to declare the present cause of action to be a class action under Rule 23. This case will, however, inure to the benefit of anyone in a like situation in this district.

Accordingly, it is hereby ordered, adjudged and decreed that the hair length regulation of the Iowa State Penitentiary pertaining to the plaintiff, an American Indian, is unconstitutional.[5]

It is further ordered that enforcement of said hair regulation by the defendants is restrained against the named plaintiff.

It is further ordered that this action will not be maintained as a class action.

It is further ordered that the foregoing shall constitute the Findings of Fact, Conclusions of Law and Order for Judgment in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

5. The propriety of this result is further demonstrated by the fact that the State of Nebraska has recently entered into a consent decree which provides, *inter alia*, that all Indian inmates incarcerated in the Nebraska Penal and Correctional Complex shall be permitted to wear traditional Indian hair styles and participate in Indian religious services and ceremonies. Indian Inmates of the Nebraska Penitentiary v. Vitek, Civil No. 72–L–156 (D.Neb. filed October 31, 1974).