Steven Robert **WINSBY**, Petitioner,

v.

**J. J. WALSH,** Warden, Federal Correctional Institution, Terminal Island, San Pedro, California, Respondent.

No. 70–2714.

United States District Court,
C. D. California.

Jan. 12, 1971.

Peter I. Ostroff, Ernest S. Gould, Los Angeles, Cal., Arthur Gottlieb, Long Beach, Cal., for petitioner.

Robert L. Meyer, U. S. Atty., Frederick M. Brosio, Jr., Asst. U. S. Atty., Chief, Civil Division, Alan W. Peryam, Asst. U. S. Atty., Los Angeles, Cal., for respondent.

## ORDER DENYING WRIT OF HABEAS CORPUS

DAVID W. WILLIAMS, District Judge.

Steven Robert Winsby is a prisoner in the Federal Correctional Institution at Terminal Island, San Pedro, California, after his conviction on marijuana charges and the resulting sentence of three years. He entered the institution approximately 14 months ago and was explained the rules and regulations of the prison and then placed in custody with the general population and given all those privileges accorded inmates who were not subject to disciplinary proceedings. At the time Winsby entered the prison he wore a short mustache but he was clean-shaven and his hair was of ordinary length. Shortly after his admission to the facility he began letting his hair grow long, and from time to time he was reminded of the regulations against long hair in the prison and was asked to have his hair cut but he refused. Eventually he was told that if he persisted in refusing to have his hair cut he would be subjected to disciplinary proceedings, but he insisted that it was his God-given right to let his hair grow and that he would continue to refuse to have it cut. This attitude led to him being placed in what prison officials term "segregation" but which the petitioner prefers to call "solitary confinement in a dungeon" and he has remained there for a period of approximately 10 months to the filing of this petition for habeas corpus asking that he be returned to the general population. During his period in segregation the petitioner has not only stalwartly refused to cut his hair but also stopped shaving and allowed his beard to grow unshorn. At the time of his appearance in Court his hair had grown so that it half-covered his ears on the side, and in the back extended to the bottom of the collar of his jacket. He wore a shaggy mustache of approximately 1½ inches in length and a full facial beard. He now claims that his refusal to cut his hair and shave his beard is based upon religious beliefs. Prior to entering prison, however, he had worn a mustache but had not worn a beard in five years. He testified that prior to entering prison he shaved and kept well-groomed because it gave him a better appearance as he went about his business affairs, but that after entering prison he no longer felt the compulsion to remove his hirsute.

The petition alleges that the confinement of Winsby for a period of 10 months amounts to cruel and inhuman punishment in violation of Eighth Amendment protection and that the prison officials' insistence upon disciplining him because he would not shave amounts to "unbridled arrogance" in enforcing unreasonable rules. It should be emphasized that during all the time petitioner has been held in segregation, repeated visitations have been made to him by custodial officers in an attempt to persuade him to change his mind, and there is no dispute but that it has been made clear to Winsby that he would be immediately released from segregation and returned to the general population the moment he relented. The Government therefore argues that during all the time the petitioner has been in segregation he has held the key to his own release.

This Court recognizes that no prison is a joy to behold but it is well-recognized that the Terminal Island Federal Correctional Institution is one of the better places of custody within the federal system. Those persons who are not subject to discipline are placed either in dormitories consisting of large rooms with many beds, or in private single-bed rooms as space permits. They have access to a day room where they can play cards, look at television or hear radio.

An auditorium provides space for the holding of meetings and the viewing of motion pictures. A large yard provides space for the playing of games and outside civilian teams are often brought in to compete with prisoners in athletic events. The average day of the usual prisoner consists of having his meals with other prisoners in regular dining facilities, exercising with other inmates and performing some type of prison work. The petitioner was employed as an orderly in the prison hospital prior to being segregated. The ordinary inmate is also allowed to receive visitors periodically in a large room furnished with tables and chairs and free from the close scrutiny of guards.

When for disciplinary reasons an inmate is placed in segregation, he is deprived of dormitory existence, group dining privileges, use of commissary and library privileges and is placed in a single-bedded room approximately six feet by eight feet which has three concrete walls with one window, and one wall consisting of bars. As a practical matter, he has no ability to mix with or converse with other prisoners and his exercise rights are limited to walking in a short nearby corridor from 20 to 45 minutes, five days each week. Besides containing a bed, the room contains a lavatory and toilet. When petitioner was held in segregation he was deprived of contact with others, not allowed to work at his hospital job, and although he was allowed to receive periodic visits from relatives and friends, those visits were confined to a conference room under greater surveillance than would ordinarily be the case and they were usually limited to one-half hour. While held in solitary confinement petitioner was allowed to take a shower daily and his meals, consisting of the same food served other prisoners, were brought to him to his cell.[1]

It is clear that the purpose of the prison officials was to keep the petitioner out of the vision of other inmates so that none of the other prisoners would be tempted to defy the prison regulations and grow long hair and beards and so that the isolation of petitioner would serve as an example to them.

At the hearing the Government defended the reasonableness of the prison regulations by calling the associate warden, the chief correctional supervisor, and the prison psychiatrist. The latter testified that in his opinion the petitioner was sincere in his belief that he had a right to refuse to cut his hair or shave, but that there was little evidence that he held strong religious beliefs supporting this conduct prior to his entry into prison and no evidence that while in prison he had a "peak experience" or had undergone conversion to a religion.

The correctional officers testified that their principal reason for objecting to bearded inmates was the difficulty in identification. They also pointed out that it brought about unsanitary conditions among such a large number of men in close custodial contact with each other. The prison has a present male population of approximately 700 persons and a total of 75 correctional officers, some of whom are supervisors or attend to special assignment duties. This results in there being available a maximum of only 20 guards to police 700 inmates during any one work shift. A high turnover of personnel adds to the difficulty in that it takes a period of time

---

1. One of the prison regulations at the time petitioner was first placed in segregation required inmates to be fully dressed before they could have their meals. During his stay in segregation petitioner further rebelled by often refusing to dress, at times remaining completely bare and on such occasions the correctional officers would refuse to serve him his meals. On each such occasion they would urge him to clothe himself so that he could be fed but it is the petitioner's testimony that his refusal to comply with this regulation caused him to miss as many as 90 meals. Eventually the correctional officers relented on this score and because of petitioner's stubbornness, changed the policy so that they fed him regardless of whether he dressed or not.

for new officers to become able to recognize the many men over whom they have custody. For some of those men to have changing lengths of hair and beards in varying styles and lengths imposes a monstrous identification problem, especially during periods when visitors are circulating around in the institution or civilian athletic teams are allowed entry. The difficulty of the correctional officers in learning the faces of the inmates is added to by the fact that Terminal Island is a short-term institution and there is a rapid introduction of new inmates.

■ I have come to the conclusion that petitioner is not entitled to the relief he seeks. His efforts to ground his opposition to shaving upon religious beliefs are smothered by evidence that, while he may be possessed of a strong code of morals, he is governed by a resolute spirit which gives him endurance as he plays his stubborn game with prison officials. He has been given countless opportunities to gain his freedom by complying with reasonable rules, but he has chosen to bring about day by day defiance of those who have his custody. To allow one man to defy regulations forbidding the wearing of long hair and beard is to invite the balance of the male population of the prison to do the same thing. In the opinion of the associate warden, half the men in Terminal Island would take advantage of any absence of a rule against beards, thus greatly increasing the difficulty of identification. There can be little doubt that identification of a large number of bearded men is more difficult than the ability to quickly recognize facial features of the same number of clean-shaven men. I have examined the rules of the prison affecting grooming and feel that they are not oppressive and that they are based on reason and are not arbitrarily enforced.

Petitioner relies heavily upon *Sostre v. Rockefeller*, 312 F.Supp. 863 (S.D.N.Y.1970). *Sostre* had spent 12 years in prison until 1964, four of which were spent in solitary confinement for Black Muslim activities. He had filed many civil rights complaints against prison officials and had thereby secured gains for other prisoners in their quest for unrestricted religious liberties. His suits had successfully attacked and eliminated other "outrageously inhumane" aspects of solitary confinement in some state prisons.

■ After a period of freedom, Sostre once again was convicted of a crime and given a long term. Taken to prison under special guard, he was met with an aura of "instant hostility" on the part of those who did not relish once again having to supervise this troublesome prisoner. The day following his return to the institution he was placed in solitary confinement under circumstances which show clearly it was for old sins rather than new infractions.[2] I know of no other case which holds that a prisoner ought be given a full hearing on notice and with counsel present before he can be disciplined and I am not prepared to follow *Sostre* if that is its holding.

The Federal Courts are loathe to interfere with internal discipline in federal or state prisons. *Beard v. Lee*, 396 F.2d 749 (C.A.Ala.1968); *Johnson v. Avery*, 382 F.2d 353 (6th Cir. 1967). Lawful incarceration necessarily operates to deprive a prisoner of certain rights and privileges he would otherwise enjoy in free society. *Courtney v. Bishop*, 409 F.2d 1185 (C.A.Ark.1969).

■ Acceptance of the fact that incarceration, because of inherent administrative problems, may necessitate the withdrawal of many rights and privileges does not preclude recognition by the Courts of a duty to protect a prisoner from unlawful and onerous treatment of a nature that, of itself, adds punitive measures to those legally meted out by the Court. *Jackson v. Goodwin*, 400 F.2d 529, 532 (5th Cir. 1968).

2. The apparent reason was for Sostre's refusal to cease "practicing law" in the institution.

"It is well established that prisoners do not lose all their constitutional rights and that the Due Process and Equal Protection Clauses of the Fourteenth Amendment follow them into prison and protect them there from unconstitutional action on the part of prison authorities carried out under the color of state law." Washington v. Lee, 263 F.Supp. 327, 331 (M.D. Ala.1966); Sewell v. Pegelow, 291 F. 2d 196, 197 (4th Cir. 1961).

The *Sewell* court declared:

"It is beyond dispute that certain rights and privileges of citizenship are withdrawn from prisoners, but it has never been held that upon entering a prison one is entirely bereft of all of his civil rights and forfeits every protection of the law." Sewell, at 198.

Prison officials are vested with wide discretion in controlling prisoners committed to their custody, but the courts should not hesitate to intervene and see that outrageously inhumane acts are corrected where there is a proper showing. Any arbitrary taking away of rights of a prisoner ought to be the subject of proper judicial inquiry. But prison authorities have a right to adopt reasonable restrictions governing the conduct of inmates. Vida v. Cage, 385 F.2d 408 (C. A.Mich.1967).

■ Regulations for the administration and discipline of prisons, promulgated and enforced by duly authorized officials, are not subject to review by the courts unless it can be clearly demonstrated that they interfere with fundamental rights guaranteed by the Constitution. United States v. Marchese, 341 F.2d 782 (9th Cir. 1965), cert. denied, 382 U.S. 817, 86 S.Ct. 41, 15 L.Ed. 2d 64; Hatfield v. Baileaux, 290 F.2d

632 (9th Cir. 1961), cert. denied, 368 U. S. 862, 82 S.Ct. 105, 7 L.Ed.2d 59.

■ This Court feels that it is an extremely serious situation when a prisoner is placed in segregation for a period of 10 months and I have therefore given close attention to the evidence so that I may determine whether the action amounts to cruel and inhuman punishment on the part of prison authorities. The facts of this case do not show that the petitioner was "sentenced" to any period of time in segregation by prison authorities and this case is not to be compared with the instance of an inmate being administratively confined in isolation for an act he did, such as an assault upon another. Winsby can actually be said to be committing a new infraction each day and since I must conclude that the prison regulations governing grooming are reasonable and have a definite purpose directly connected with the duty of the warden to see that inmates do not escape, I conclude that petitioner's conduct is the wilful continuous violation of a reasonable rule for which he could release himself at any time if he chose to do so.

Cases in which Federal Courts have held that prison regulations requiring inmates to be clean-shaven and to wear shortened hair include Brown v. Wainwright, 419 F.2d 1376 (5th Cir. 1970); Brooks v. Wainwright, 428 F.2d 652 (5th Cir. 1970); Blake v. Pryse, 315 F. Supp. 625 (D.C.Minn.1970).

## CONCLUSION

The Court therefore finds that the rules and regulations of which petitioner complains are reasonable, do not constitute cruel and inhuman punishment and are well within the discretion lodged with prison officials. The petition is denied.