No. 73–459. New Rider et al. v. Board of Education of Independent School District No. 1, Pawnee County, Oklahoma, et al. C. A. 10th Cir. Certiorari denied.

Mr. Justice Douglas, with whom Mr. Justice Marshall concurs, dissenting.

Petitioners are male Pawnee Indians who are students at Pawnee Junior High School, a public school in Oklahoma. They sought to wear their hair parted in the middle with a long braid on each side so that, in their words, they could follow the "old traditional ways"

and because such a hairstyle was "one way of telling people that I am proud [to be an Indian]." Others testified that young Indians sought to wear braided hair because of a new-found pride in their heritage, in an attempt to "regain their tradition, to learn their culture."

These youths were suspended from school indefinitely on April 24, 1972,[1] for being in violation of a school hair-length regulation, which forbids hair reaching the shirt collar or ears. The Court of Appeals justified the suspension on the ground that the regulation was rational in that it sought to achieve the objective of "instilling pride and initiative among the students leading to scholarship attainment and high school spirit and morale." The court stressed testimony from one school superintendent that a school system cannot countenance different groups and still remain one organization.

Petitioners claim, *inter alia,* that the school hair-length restriction unjustifiably impinges on the freedom of expression guaranteed them by the First and Fourteenth Amendments. This Court has consistently, over my dissents, refused to review lower court decisions passing on the constitutionality of school hair-length regulations, whether such regulations have been upheld or struck down, and regardless of the grounds on which the lower courts have reached their conclusions. I have noted the deep division among the Circuits on this issue, and have thought that it is an issue of particular personal interest to many and of considerable constitutional importance. See *Freeman* v. *Flake,* 405 U. S. 1032; *Olff* v. *East Side Union High School District,* 404 U. S. 1042.

---

[1] The suspension was stayed by a preliminary injunction of the District Court which apparently ran from May 1, 1972, to June 5, 1972, and apparently also by a stay entered by the Court of Appeals which ran from July 6, 1973, to September 4, 1973. Respondents claim that the suspension of petitioners was not permanent, but this is contradicted by the Court of Appeals' opinion.

Petitioners were not wearing their hair in a desired style simply because it was the fashionable or accepted style, or because they somehow felt the need to register an inchoate discontent with the general malaise they might have perceived in our society. They were in fact attempting to broadcast a clear and specific message to their fellow students and others—their pride in being Indian. This, I believe, should clearly bring this case within the ambit of *Tinker* v. *Des Moines School District*, 393 U. S. 503, where we struck down a school policy which refused to allow students to wear black armbands in protest of the Vietnam war. We recognized that such armbands were closely akin to pure speech and were entitled to First Amendment protection, *id.*, at 505–506, at least where, as here,[2] there was no finding that the operation of the school was substantially endangered by the symbolic speech:

> "In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the

[2] Petitioners claim that "[r]espondents admitted that petitioners' traditional hairstyle has never caused any disruption in the school." Respondents do not contradict this statement, but only assert that the regulation on length of hair "bears a rational relationship to a legitimate state objective, i. e., that of instilling pride and initiative among the students leading to scholarship attainment and school spirit and morale."

operation of the school,' the prohibition cannot be sustained." *Id.*, at 509.

As previously noted, there was an opinion voiced by school officials that allowing petitioners to wear their hair in an Indian manner while restricting the hair length of white students would somehow be "disruptive," in that an "integrated school system cannot countenance *different groups* and remain *one* organization." But as we noted in *Tinker,* this Court long ago recognized that our constitutional system repudiates the idea that a State may conduct its schools to " 'foster a homogeneous people.' " *Id.*, at 511. In *Meyer* v. *Nebraska,* 262 U. S. 390, 402, the Court said:

> "In order to submerge the individual and develop ideal citizens, Sparta assembled the males at seven into barracks and intrusted their subsequent education and training to official guardians. Although such measures have been deliberately approved by men of great genius, their ideas touching the relation between individual and State were wholly different from those upon which our institutions rest; and it hardly will be affirmed that any legislature could impose such restrictions upon the people of a State without doing violence to both letter and spirit of the Constitution."

And in *Keyishian* v. *Board of Regents,* 385 U. S. 589, 603, we stated:

> " 'The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.' *Shelton* v. *Tucker,* [364 U. S. 479,] 487. The classroom is peculiarly the 'marketplace of ideas.' The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out

of a multitude of tongues, [rather] than through any kind of authoritative selection.' "

The effort to impose uniformity on petitioners is especially repugnant in view of the history of white treatment of the education of the American Indian. In the late 1800's, at about the same time that the Dawes Severalty Act of 1887 fragmented Indian tribal land holdings and allotted land to individual Indians with the effect of breaking up tribal structures,[3] the Bureau of Indian Affairs (BIA) began operating a system of boarding schools with the express policy of stripping the Indian child of his cultural heritage and identity:

> "Such schools were run in a rigid military fashion, with heavy emphasis on rustic vocational education. They were designed to separate a child from his reservation and family, strip him of his tribal lore and mores, force the complete abandonment of his native language, and prepare him for never again returning to his people." [4]

Again in 1944, a House Select Committee on Indian Affairs offered the same recommendation for achieving the " 'final solution of the Indian problem' ": " 'The goal of Indian education should be to make the Indian child a better American rather than to equip him simply to be a better Indian.' " [5]

A massive study by the Senate Special Subcommittee on Indian Education, "Indian Education: A National Tragedy—A National Challenge," S. Rep. No. 91–501, reviewed this policy, which it found rooted in a "self-righteous intolerance of tribal communities and cultural

---

[3] See S. Rep. No. 91–501, p. 12; cf. Special Education Subcommittee of the National Council on Indian Opportunity, Between Two Milestones 69 (1972).

[4] S. Rep. No. 91–501, p. 12.

[5] See id., at 13–14.

differences." *Id.*, at 21. The Subcommittee found that many teachers in BIA schools

> "still see their role as that of 'civilizing the native.' . . . One consequence of the unfortunate situation is a serious communications breakdown between student and staff and a serious lack of productive student-staff interactions.
>
> ". . . BIA administrators and teachers believe that Indians can choose only between total 'Indian-ness'—whatever that is—and complete assimilation into the dominant society. There seems to be little if any understanding of acculturation processes or the desirability of 'combining a firm cultural identity with occupational success and consequent self-esteem.'" *Id.*, at 61–62.

The same study found that similar attitudes often exist in public schools which educate Indian students.[6]

The results of such a policy, mirrored in the policy of the school in this case to force all students into one

---

[6] *"Many school administrators and teachers consider Indian pupils inferior to white students, and thus expect them to fail, both in school and in life.*

"A. An anti-Indian attitude is often prevalent in white communities in which Indians receive public school education.

"B. Many school districts relegate Indians to the lowest level in their tracking systems.

"C. Some administrators refuse to cooperate with the Indian community in their school district and discourage or do not permit Indian participation in decisionmaking.

"D. Indians are often promoted each year regardless of grades just so they can be kept in school, thus assuring the local district of receiving Federal aid because of the presence of Indian students. One public school district goes so far as to falsify Indian achievement-test results because the students were so far behind national norms that 'it just wouldn't look good.'

"E. Teachers and administrators are often insensitive to Indian values and ignorant of Indian culture." *Id.*, at 53.

homogeneous mold even when it impinges on their racial and cultural values, have been disastrous for the young Indian child who is taught in school that the culture in which he has been reared is not important or valid. The Subcommittee recognized that such a coercive assimilation policy, denigrating and seeking to abolish cultural differences, frustrates Indian children and leads "[t]he community and child [to] retaliate by treating the school as an alien institution." *Id.*, at 21. At least in part as a result of such alienation, American Indians in both public and federal schools have a dropout rate twice the national average. *Id.*, at ix. Only 33% of Indians over the age of 25 have completed high school, and the median number of school years completed by this group is only 9.8.[7] Even when an Indian youth nominally remains in school, his achievement level is generally 2 to 3 years below that of white students in the same grade, and the Indian child falls progressively further behind the longer he remains in school.[8]

The issues in this case are far from trivial. I would grant certiorari.

---

[7] Bureau of the Census, Subject Report: American Indians, PC (2)–1F, p. 18 (Table 3) (1973).

[8] S. Rep. No. 91–501, p. ix; see Comptroller General of the United States, Report to the Congress: Opportunity to Improve Indian Education in Schools Operated by the Bureau of Indian Affairs 10 (1972).