**Jack L. WRIGHT, Plaintiff,**

v.

**Robert R. RAINES et al., Defendants.**

**No. 77–3043.**

United States District Court,
D. Kansas.

July 7, 1978.

Jack L. Wright, pro se.

Roger N. Walter, Asst. Atty. Gen., Topeka, Kan., for defendants.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

### Discussion

Plaintiff, Jack L. Wright, an inmate of the Kansas State Penitentiary (KSP) at Lansing, Kansas, brings this action pursuant to 42 U.S.C. § 1983 seeking redress for the alleged unconstitutional interference by state prison authorities with the free exercise of his religion.

Jurisdiction is invoked pursuant to 28 U.S.C. § 1343. Leave to proceed *in forma pauperis* was granted, summons issued, an answer was filed, and a pre-trial conference was conducted. Thereafter, defendants filed a motion for summary judgment which, after oral argument to the Court, was granted with respect to plaintiff's due process and monetary damages claims, but denied as to plaintiff's claim for injunctive and declaratory relief from unconstitutional interference with plaintiff's religious beliefs.

Plaintiff's claim arises from the allegation that he is a practitioner of the Sikh religion which prohibits the cutting of hair from one's body. Plaintiff has been punished by the prison officials because of his refusal to comply with Administrative Policy No. 207 of the Kansas Department of Corrections which require all inmates to be clean-shaven except for sideburns and mustaches.

Thus, the central issue presented by the case is whether prison officials may validly prohibit plaintiff from following the dictates of his religion which prevent him from shearing hair from his body.

This Court has already undertaken an extensive discussion of the controlling legal principles. In our order of January 24, 1978, in which we established the framework for the summary judgment hearing which was held on March 29, 1978, we wrote:

It is clear that the State's regulation of the hair length of a prison inmate is not *per se* unconstitutional. *Daugherty v. Reagan,* 446 F.2d 75 (9th Cir. 1971); *Rinehart v. Brewer,* 360 F.Supp. 105 (S.D. Iowa 1973), aff'd 491 F.2d 705 (8th Cir. 1974); *Ralls v. Wolfe,* 448 F.2d 778 (8th Cir. 1971); *United States ex rel. Goings v. Aaron,* 350 F.Supp. 1 (D.Minn.1972). However, the instant action is distinguishable from these cases in that the hair regulation challenged herein is alleged to infringe upon the plaintiff's right to freely exercise his religious beliefs. When an inmate is coerced by a state-imposed sanction to perform acts contrary to the fundamental tenets of his religion, the First Amendment's guarantee of free exercise of religious expression is infringed. *Wisconsin v. Yoder,* 406 U.S. 205 [92 S.Ct. 1526, 32 L.Ed.2d 5] (1972); *Monroe v. Bombard,* 422 F.Supp. 211 (S.D.N.Y.1976); *Jihaad v. Carlson,* 410 F.Supp. 1132 (E.D.Mich.1976); *Teterud v. Gillman,* 385 F.Supp. 153 (S.D.Iowa 1974); aff'd sub nom *Teterud v. Burns,* 522 F.2d 357 (8th Cir. 1975).

Of course, the circumstance of imprisonment is a factor which bears upon the

lawfulness of limitations placed on religious practices; and while in custody, inmates have only such rights in practice of their religion as can be exercised without impairing the requirements of prison discipline, *Kennedy v. Meacham, supra* [382 F.Supp. 996]; *Long v. Parker,* 390 F.2d 816 (3d Cir. 1968); *Cochran v. Sielaff,* 405 F.Supp. 1126 (S.D.Ill.1976). But where the actions of prison officials curtail religious freedoms, the State must show compelling justification for such deprivations. *Griffin v. Bennett,* No. 76–84–C3 .(D.Kan., June 2, 1976); *Long v. Harris,* 332 F.Supp. 262 (D.Kan.1971), aff'd 473 F.2d 1387 (10th Cir. 1972); *United States ex rel. Jones v. Rundle,* 453 F.2d 147 (3rd Cir. 1971). The State's asserted justification for this restriction on plaintiff's religious practices must be shown to outweigh the inmate's First Amendment rights. *Kennedy v. Meacham, supra; Hoggro v. Pontesso,* 456 F.2d 917 (10th Cir. 1972); *see also Cruz v. Beto,* 405 U.S. 319 [92 S.Ct. 1079, 31 L.Ed.2d 263] (1972); *Cooper v. Pate,* 378 U.S. 546 [84 S.Ct. 1733, 12 L.Ed.2d 1030] (1964).

We further expounded upon the applicable law in our order of May 25, 1978, which denied that portion of defendants' summary judgment motion which concerned plaintiff's prayer for injunctive and declaratory relief invalidating Rule 207:

It is well-settled that the supervision of state prisons is a legitimate and important state function, and state prison authorities are vested with a wide degree of discretion in the daily control and operation of their facilities. *Marchesani v. McCune,* 531 F.2d 459 (10th Cir. 1976) *cert. denied* 429 U.S. 846 [97 S.Ct. 127, 50 L.Ed.2d 117]; *Perez v. Turner,* 462 F.2d 1056 (10th Cir. 1972) *cert. denied,* 410 U.S. 944 [93 S.Ct. 1381, 35 L.Ed.2d 611] (1973); *Evans v. Moseley,* 455 F.2d 1084 (10th Cir. 1972), *cert. denied,* 409 U.S. 889 [93 S.Ct. 160, 34 L.Ed.2d 146]; *Banning v. Looney,* 213 F.2d 771 (10th Cir. 1954), *cert. denied* 348 U.S. 859 [75 S.Ct. 84, 99 L.Ed.2d 677] (1954). "The practical effect of incarceration upon individual liberties is given

expression in the oft-quoted words of the Supreme Court, '. . . lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system,' *Price v. Johnston,* 334 U.S. 266, 285· [68 S.Ct. 1049, 92 L.Ed. 1356] (1948.)" *Rinehart v. Brewer,* 360 F.Supp. 105 (S.D. Iowa C.D.1973), aff'd 491 F.2d 705 (8th Cir. 1974); *accord: Long v. Harris,* 332 F.Supp. 262 (D.Kan.1971) aff'd 473 F.2d 1387 (10th Cir. 1972). Equally established is the basic principle that a citizen does not lose all his or her rights as a result of incarceration, *Burgin v. Henderson,* 536 F.2d 501 (2d Cir. 1976); *Jackson v. Bishop,* 404 F.2d 571 (8th Cir. 1968); *see also, Wolff v. McDonnell, supra* [418 U.S.] 555–56 [94 S.Ct. 2963, 41 L.Ed.2d 935]; *Procunier v. Martinez,* 416 U.S. 396 [94 S.Ct. 1800, 40 L.Ed.2d 224] (1974). Thus, the federal court cannot eschew its responsibility to investigate alleged constitutional deprivations by reason of the wide discretion vested in prison administrators. *See Haines v. Kerner,* 404 U.S. 519 [92 S.Ct. 594, 30 L.Ed.2d 652] (1972); *Cruz v. Beto,* 405 U.S. 319 [92 S.Ct. 1079, 31 L.Ed.2d 263] (1972); *Lee v. Crouse,* 284 F.Supp. 541 (D.Kan.1967) aff'd 396 F.2d 952 (1968). . . .

. . .

Defendants, in their Memorandum in Support of Motion for Summary Judgment cite several cases purportedly upholding prison grooming regulations in the face of similar First Amendment challenges. However, after a careful reading of these cases, the court finds them to be factually distinguishable either because a fundamental tenet of an established religion was not implicated [*New Rider v. Board of Education of Independent School District No. 1, Okla.,* 480 F.2d 693 (10th Cir. 1973) *cert. denied* 414 U.S. 1097 [94 S.Ct. 733, 38 L.Ed.2d 556] (uncut hair not fundamental tenet of Indian beliefs) *see concurring opinion; Rinehart v. Brewer,* 360 F.Supp. 105 (S.D. Iowa C.D.1973), aff'd 491 F.2d 705 (8th

Cir. 1974) (uncut hair not fundamental tenet of Church of New Song); *United States ex rel. Goings v. Aaron,* 350 F.Supp. 1 (D.Minn.1972) (uncut hair not fundamental tenet of Indian religion); *Williams v. Batton,* 342 F.Supp. 1110 (E.D.N.C.1972) (religion not even specified, thus not established); *Winsby v. Walsh,* 321 F.Supp. 523 (D.C.Calif.1971) (religion not even specified); *Brooks v. Wainwright,* 428 F.2d 652 (5th Cir. 1970) (prisoner claimed *he* was a religion, not established religion); *Brown v. Wainwright,* 419 F.2d 1376 (5th Cir. 1970) (prisoner relied upon a personal "divine revelation" and scripture from Old Testament of Bible, not fundamental tenet)] or because the basis for .the claim is an asserted right other than to freedom of religious expression. *Kelley v. Johnson,* 425 U.S. 238 [96 S.Ct. 1440, 47 L.Ed.2d 708] (1976) (freedom of choice); *Hill v. Estelle,* 537 F.2d 214 (5th Cir. 1976) (equal protection and freedom from cruel and unusual punishment); *Ralls v. Wolfe,* 448 F.2d 778 (8th Cir. 1971) (freedom from discrimination); *Daugherty v. Reagan,* 446 F.2d 75 (9th Cir. 1971) (unspecified civil rights); *Poe v. Werner,* 386 F.Supp. 1014 (M.D.Pa.1974) (equal protection); *Collins v. Haga,* 373 F.Supp. 923 (W.D.Va. 1974) (personal preferences).

The above-cited cases which upheld prison hair regulations against constitutional challenges other than the interference with religious freedoms are not controlling here for an additional reason. The right to freely practice one's religion is regarded as one of the most cherished values enumerated in the United States Constitution. *Wisconsin v. Yoder,* 406 U.S. 205, 214–215 [92 S.Ct. 1526, 32 L.Ed.2d 15] (1972); *Sherbert v. Verner,* 374 U.S. 398 [83 S.Ct. 1790, 10 L.Ed.2d 965] (1963). It has also been recognized that religion subserves the rehabilitative function in prisons in that it provides "an area within which the inmate may reclaim his dignity and reassert his individuality." *Barnett v. Rodgers,* [133 U.S. App.D.C. 296] 410 F.2d 995, 1002 (D.C. Cir. 1969); *Cochran v. Rowe,* 438 F.Supp.

566, 570 (N.D.Ill.1977). While the right may not be absolute, it sufficiently implicates important First Amendment values to be entitled to significant protection. *Cruz v. Beto, supra; Clay v. United States,* 403 U.S. 698, 702–03 [91 S.Ct. 2068, 29 L.Ed.2d 810]; *Smith v. Laird,* 486 F.2d 307, 311 (10th Cir. 1973).

With these legal principles in mind, and having found that Sikh Dharma is a recognized religion, we formulated four principle issues to be focused upon at trial:

(1) Is uncut hair a fundamental tenet of the Sikh religion?

(2) Is the plaintiff a sincere adherent of the Sikh religion?

(3) Does the State's legitimate interest in security within its penal institutions outweigh the plaintiff's right to practice the Sikh religion?

(4) Could the State's interest in security be served in a less-restrictive manner which would not interfere with plaintiff's religious beliefs?

Just before trial, defendants conceded the first two of the issues listed above, admitting that plaintiff is a sincere adherent of the Sikh religion and that uncut hair is a fundamental tenet of the Sikh religion. Thus, as the trial of this action began on June 26, 1978, it was established that: (1) the Sikh Dharma is an established religion; (2) *plaintiff is a sincere adherent of the religion;* and (3) uncut hair is a fundamental tenet of the Sikh religion.

Only two issues remained for our consideration at trial: (1) whether the State's interest in security outweighed plaintiff's interest in religious freedom, and (2) whether the State's interest in security could be served in a less-restrictive manner. These are mixed issues of fact and law which were tried to the Court.

Plaintiff did not present much evidence at trial, for defendant's last minute concession of two of the crucial issues of the case made much of plaintiff's prepared testimony unnecessary. Most of the evidence presented was by defendants in an attempt to justify Rule 207 on identification and security grounds.

While defendants in many of the cases discussed in our earlier orders have sought to justify grooming regulations in prisons on such grounds as sanitation in food preparation, personal hygiene, security against contraband, and safe operation of machinery, defendants' case was founded solely upon security. Specifically, defendants sought to demonstrate that identification is critical to security of a prison, and that facial hair impeded identification by hiding important facial features, such as the shape of the jaw. The problem of identification, defendants' witnesses testified, is heightened at KSP because of the high turnover of staff and inmates. It was estimated that although the population at Lansing at any given time is around 900, at least twice that number of individuals will be in KSP during the course of a year because of the high turnover. (Defendants' testimony was contradictory on this point.) Further, the staff turnover each year is at least one-third.

Defendants' testimony sought to establish that allowing inmates to grow facial hair would cause security problems in (1) internal discipline, (2) entering and leaving the prison, and (3) recapturing escapees. Defendants' witnesses testified to several incidents in which they thought security was hampered by the allowing of facial hair.

One witness testified that in Indiana a bearded, long-haired inmate walked away from a camp and was later accosted by a guard who failed to arrest him because the inmate did not have the long-hair and beard which he had had in the prison.

Another witness testified that during an earlier period when defendants had eliminated the hair code two inmates had walked out of the Kansas State Industrial Reformatory at Hutchinson posing as visitors after shaving their beards.

Another incident concerned a walkaway from KSP who was allegedly accosted by several law enforcement officials, but arrested by none of them because he had altered his muttonchop sideburns.

A final incident to which defendants' witnesses testified involved a fight at the Kansas State Industrial Reformatory. It was stated that a guard had been unable to identify two inmates who had attacked a third inmate because the two attackers wore beards.

Defendants' witnesses further testified (1) that alternate methods of security would not adequately replace the hair code, and (2) allowing an exception to the code on grounds of plaintiff's religious convictions would not work, for "in a prison you cannot do for one inmate what you are not prepared to do for all."

The Court has carefully weighed the testimony presented by defendants' witnesses. We felt that plaintiff's cross examination was more than adequate considering his *pro se* status.

We note initially that all of defendants' witnesses were prison officials. The testimony of defendants' witnesses was exactly what the Court would expect from prison officials. While we have no doubt that these are honorable, knowledgeable, and sincere men, we cannot fail to note their perspective of, or interest in the issue before the Court. The witnesses uniformly predicted doom should any change whatsoever be made in Rule 207. Yet, we must take these predictions with at least a small grain of salt. At the hearing on the summary judgment motion, we learned that plaintiff had been segregated from even other inmates in protective custody because of his violation of Rule 207. Thus, for some period of time plaintiff was required to eat alone, and to take his exercise period at 4:00 a. m. These restrictive measures were imposed because prison officials predicted that if other inmates were allowed to view plaintiff while he wore his beard (thus "flouting" the prison rules), it would cause serious disturbances. Yet, since the summary judgment hearing plaintiff has been allowed to freely associate with other protective custody inmates, and the only evidence before the Court indicates that disruptions such as were predicted by the prison officials have not occurred.

The evidence before the Court does convince us that identification is important to

the security of a prison. We are further convinced that ease of identification is somewhat hampered by the growth (and perhaps subsequent alteration) of a beard. However, we are not completely convinced of defendants' position concerning the examples of escapes which were allegedly facilitated by the growth of beards. We view the conclusions of defendants' witnesses to the effect that men escaped, or avoided recapture, solely because of their ability to shave a beard which they had grown, to be largely speculative.

While defendants' testimony indicated that a guard had been unable to identify two inmates who had attacked another, we suspect that more than the beards of the attackers prevented identification by the guard. It is mere speculation that the guard would have been able to identify the attackers had they not worn beards. Similar speculation pervades the other examples given by defendants.

It is certainly true that when an inmate escapes and subsequently shaves his beard and cuts his hair, he may be more difficult to capture. However, the same effect may be obtained by a change of clothes, the addition of a wig, or the application of hair dye. Further, defendants now allow mustaches and long hair, which could also be readily altered. What greater incremental impediment to identification is caused by a beard was not clearly shown.

We note that despite their concern with having an up-to-date photograph of all inmates, which they allege would be impossible if inmates were allowed to grow beards, defendants have not, the evidence indicates, been consistent in maintaining such up-to-date photographs even in the presence of the hair code. Inmates are photographed when they enter the prison. Their hair is initially cut to a length of 1½", but may thereafter be grown to any length.

Defendants' witnesses admit that the key factor in the security problem will be the number of inmates who attempt to grow beards. It seems obvious that a beard could substantially aid identification, rather than hinder it, if only a few inmates wore beards. Thus, if only 30 of the 900 inmates at Lansing wore beards, and a bearded inmate was spotted committing an infraction of the rules, the number of suspects would be immediately reduced from 900 to 30.

While one of defendants' witnesses testified that if plaintiff prevailed a "vast" number of inmates would grow beards, another witness testified that he would expect only 30 to grow beards. Yet another testified that five or six Sikhs would be all that he would expect. The latter number is, in the Court's view, the most realistic. During a one year period in which the Federal Bureau of Prisons allowed beards for inmates with a religious claim, only 1% of the prisoners asserted an interest in growing a beard. *Moskowitz v. Wilkinson*, 432 F.Supp. 947, 951 (D.Conn.1977).

Surely if only five or six inmates at KSP wore beards, the security problems which defendants anticipate would not materialize. When the Federal Bureau of Prisons allowed beards for religious reasons, "it experienced no serious problems with identification, security or escapes." *Moskowitz v. Wilkinson, supra,* 432 F.Supp. 947.

To predict that many inmates would claim to be Sikhs and thus attempt to grow beards should plaintiff prevail is to assume that the prison officials would not be able to pick out the imposters. We think that this is a false assumption. The prison officials must make factual determinations every day before punishing inmates for rules violations. The machinery for making those determinations is therefore already existent. Other courts have assumed that prison officials could make the factual determinations which would be necessary. *Moskowitz v. Wilkinson, supra,* 432 F.Supp. at 951; *Maguire v. Wilkinson,* 405 F.Supp. 637, 642, n. 7 (D.Conn.1975). In *Monroe v. Bombard,* 422 F.Supp. 211, 218 (S.D.N.Y. 1976), the court noted:

> Needless to say, in granting to inmates the right to wear beards out of religious conviction, the state is entitled to scrutinize the sincerity and bona fides of those prisoners seeking to avail themselves of the entitlement, and to reject the claims

of those prisoners which are obvious shams.

It should not be especially difficult to determine which inmates are sincere adherents to the Sikh religion, since they would be required, among other things, (1) to refrain from cutting their hair, (2) to always wear their hair inside a turban, (3) to take a cold shower every morning, and (4) to refrain from consuming meat, eggs, alcohol, tobacco, or narcotics.

A consistent theme sounded by defendants' witnesses was that an exception to Rule 207 could not be made for plaintiff because of the disruptive effect such an exception would have upon the other inmates. Although defendants' witnesses testified that no privilege could be granted to one inmate which was not granted to all, it was at the same time admitted that special provisions had been made for religious privileges for Muslims. Further, the relief for which plaintiff prays would not constitute an exception, for any inmate who met the three criteria (recognized religion, sincere belief, fundamental tenet) would be allowed to refrain from shaving. The predicted dissatisfactions from such a so-called "exception" did not materialize during the federal experience in allowing beards for religious reasons. *Moskowitz v. Wilkinson, supra,* 432 F.Supp. at 951.

Further, the evidence convinces the Court that other methods of security which would have a less adverse impact upon plaintiff's religious freedom, could offset any adverse effect which a ruling in plaintiff's favor might have upon security. Under cross examination, defendants' witnesses admitted that such devices as identification cards, special passes, ink which showed up under black light, and rephotographing could to some extent improve security. Other courts have recognized that rephotographing could counteract any security problem caused by an inmate's growing of facial hair. *Teterud v. Gillman,* 385 F.Supp. 153, 160 (S.D.Iowa 1974), *aff'd sub nom. Teterud v. Burns,* 522 F.2d 357 (8th Cir. 1975); *Monroe v. Bombard, supra,* 422 F.Supp. at 217.

Defendants' witnesses testified that a program of rephotographing would cause an administrative burden upon penitentiary officials. This is true, but as the court said in *Teterud v. Burns, supra,* 522 F.2d at 361:

> The record does not show, however, that any increased administrative burden would be greater than that normally encountered when the constitutional rights of prisoners are enforced.

In summary, we recognize that to some extent the growing of beards by prison inmates inhibits identification by officials, and that this results in a decrease in the level of security. However, the evidence before the Court convinces us that under the circumstances presented by this case, the reduction in security which would stem from a ruling in plaintiff's favor would be infinitesimal. The Tenth Circuit has stressed that

> . . . the asserted justification of such restrictions on religious practices based on the State's interest in maintaining order and discipline must be shown to outweigh the inmates' First Amendment rights. [*Kennedy v. Meachum,* 540 F.2d 1057, 1061 (1976)]

When we weigh the small impact on security which a ruling in plaintiff's favor would produce, against the undoubted adverse impact of Rule 207 upon an admittedly sincere religious adherent to a recognized religion, we must conclude that the Rule cannot be sustained. The State's interest in security does not outweigh plaintiff's interest in the unfettered exercise of his religion. Rule 207 does not represent the least restrictive method of obtaining the goal of security. We agree with the conclusion of the Court in *Monroe v. Bombard, supra,* 422 F.Supp. at 218:

> In sum, the various rationales for a no-beard rule posited by the state will not support the concomitant constitutional infringement on certain inmates' free exercise of their religion. "Justifications founded only on fear and apprehension are insufficient to overcome rights asserted under the First Amendment." *Teterud v. Burns, supra,* 522 F.2d at 361–362.

*See Tinker v. Des Moines Community School Dist.,* 393 U.S. 503, 508–09, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). The proof adduced at the various hearings leaves me with no doubt that the institutional requirements of Greenhaven Prison with respect to security and prisoner identification can reasonably be met through other viable and less restrictive means than the absolute ban on the wearing of beards by inmates. As such, Regulation 2.5 of the Greenhaven Correctional Facility, to the extent that it prohibits its Sunni Muslims at the prison from growing beards in conformity with their religious beliefs, is violative of the First Amendment. Since the no-beard rule at Greenhaven, as applied to Sunni Muslims, is not justified by any "important or substantial government interest", *see Kahane v. Carlson, supra,* 527 F.2d [492] at 495 n. 6, its operation must be enjoined.

In reaching our conclusion, we realize that should our prediction as to the number of beards which might appear at KSP pursuant to this holding be much too low, the weighing process which we have performed might have to be redone. However, we do not expect this to be the case.

Despite the cries of doom issued by defendants' witnesses, we note that the Federal Bureau of Prisons in Policy Statement # 7300.64D (4/12/78) allows mustaches, beards, and long hair. Similarly, the penal systems of approximately half the states allow beards. *Moskowitz v. Wilkinson, supra,* 432 F.Supp. at 950. Further, we note that Robert Raines, one of the original defendants in this action [who was recently replaced as a defendant by his successor, Acting Director of Corrections James Marquez] is cited in *Teterud v. Burns, supra,* 522 F.2d at 361, n. 10, as having testified that the justifications offered in support of hair-length regulations are "penological myth."

It is our ultimate conclusion that plaintiff's prayer for injunctive and declaratory relief which would lift from him the burdens imposed by defendants' enforcement of Rule 207 must be granted.

### Findings of Fact

1. The Sikh Dharma is a recognized, established religion.

2. Plaintiff is a sincere adherent of the Sikh Dharma religion.

3. One of the fundamental tenets of the Sikh Dharma religion prohibits plaintiff from shearing any of the hair on his body.

4. Were relief granted to plaintiff, and anyone in plaintiff's position, there would not be a vast increase in the number of sincere Sikh adherents at KSP.

5. Were relief granted plaintiff, the adverse impact upon security at KSP would be very insignificant.

6. Rule 207 clearly infringes upon plaintiff's free exercise of religion.

7. Defendants' interest does not outweigh plaintiff's interest in the free exercise of his religious beliefs.

8. Rule 207 does not represent the least restrictive method of obtaining a given security result.

9. All conclusions of law which are herein labeled as findings of facts shall be considered to be conclusions of law.

### Conclusions of Law

1. To be in position to challenge a prison regulation on grounds that it infringes upon his exercise of religious freedom, an inmate must show: (1) that his religion is a recognized religion (2) that he is a sincere adherent of the religion; and (3) that the practice inhibited by the prison regulation is a fundamental tenet of the religion.

2. If a plaintiff has demonstrated the three requisites discussed in COL # 1, the evidence must show that the prison's interest in security is actually fostered by the challenged regulation and that that interest outweighs the prisoner's interest in religious freedom.

3. For a regulation which infringes upon freedom of religion to be sustained, it must be shown to be the least-restrictive method of effectively achieving the security goal which is sought.

4. In this case, defendants' interest in security which is furthered by Rule 207 does not outweigh plaintiff's interest in the free exercise of his religious freedom.

5. Rule 207 is not the method of achieving security which least restricts the exercise of religious freedom.

6. All findings of fact which are herein labeled as conclusions of law shall be deemed to be findings of fact.

IT IS THEREFORE ORDERED AND ADJUDGED that Rule 207 be declared unconstitutional and invalid, and that defendants be enjoined from enforcing the same, to the extent that such regulation and its enforcement prevents the growing of long hair and a beard by a sincere adherent of a recognized religion which requires long hair and a beard as one of its fundamental tenets.

IT IS FURTHER ORDERED that defendants immediately cease any punitive actions which are being taken against plaintiff as a result of his failure to comply with Rule 207.

IT IS SO ORDERED.